We will hear argument first this morning in Case 21-1043, Abitron Austria GmbH v. Hetronic International. Mr. Walker. Mr. Chief Justice, and may it please the Court, the Lanham Act does not apply to petitioners' use of trademarks in foreign countries because nothing in the Act provides the clear, affirmative, and unmistakable indication needed to overcome the presumption against extraterritoriality, especially as to foreign defendants like petitioners. The text of the statute never says it applies to uses of trademarks outside the United States, and it is a foundational principle of both U.S. and international trademark law, embodied in multiple treaties, that trademark protections are inherently territorial and do not extend beyond the borders of the country granting protection. Any argument that the Act departs from that long-standing principle would have to be based on especially compelling evidence. But here, Hetronic International offers only the text definition of commerce, and this Court has repeatedly rejected the notion that commerce language is enough to extend a law to foreign conduct, even if that language otherwise invokes the full scope of a constitutional commerce power. International also invokes this Court's decision in Steele, but Steele by its terms addressed only the Act's application to U.S. citizens acting abroad. There is no reason to discard that self-imposed limit and extend Steele to reach foreign defendants like petitioners. To the contrary, extending the Lanham Act's reach into foreign countries would create the very risk of international friction that this Court's current extraterritoriality doctrine seeks to avoid. That leaves the suggestion that imposing liability for foreign sales to foreign buyers by foreign companies somehow qualifies as a domestic application of the Act. But as International itself concedes, applying U.S. law to conduct abroad based on effects in the United States is an extraterritorial application of the law. It is not a way of applying a non-extraterritorial law domestically. Both the text and the focus of the Lanham Act require a domestic use of the mark in commerce. Because petitioners' foreign sales involve only uses outside the United States, they fall outside the Act's scope. I welcome the Court's questions. Could you imagine any set of circumstances where a sale that involves an international transaction could also involve conduct in the United States that violates the Lanham Act? So I think one example here would be the 202,000 euros worth of direct sales to U.S. customers. So those sales involve foreign buyers, the petitioners who were overseas at the time, but they were sold into the United States to foreign buyers. I think in that situation, the mark is being used on those goods in commerce within the territory of the United States. And so we have not disputed that that's a permissible domestic application of the Lanham Act here. I don't understand what that difference is from the sales to people in foreign countries who designated the United States as the mailing address. You know that they're buying it to ship it into the U.S. Why aren't you aiding and abetting? And isn't that an effect as direct as the Lanham Act can ask for? You're interfering with commerce in the United States. Two points on that. So the 3% of sales are the goods that may have eventually reached the United States. No, no, no. There was a bunch of goods in that second category that you sold to foreign buyers for delivery to an address in the United States. So the delivery was actually in the foreign country. They delivered to the buyers in the foreign country. The delivery address on there actually meant that it had to be compatible with, say, FCC regulations so it could be used in the United States. And so it was being sold to, for example— You're begging the question. So even apart from that, I think what you would have there is the use of the mark in the United States is going to be when that is imported or maybe resold in the United States when it reaches the territory. So even if you know that it's gone to the U.S., you're not responsible? I think in that situation, it might be a question— you could definitely reach the person who brings it into the United States, but if it's a foreign buyer, it would have to be on a theory of contributory liability. And there's been no argument here that we would be responsible on a contributory liability theory for people who later brought goods into the United States and may have violated the Lanham Act in the United States that way. Doesn't your view overrule Steele? It doesn't. Explain how. So Steele, by its terms, from its very first sentence and throughout its rationale, addressed how the Act applies to United States citizens who are acting abroad and also acting within the United States. It did not address how it applies to foreign defenders. So explain to me how a U.S. citizen in a foreign country who does exactly what your client does, why should they be responsible but you not? So I think under the Court's modern extraterritoriality doctrine, that's a very good question as to whether there should be a difference and that U.S. citizens acting abroad should get the same benefit of that presumption. But Steele was decided well before that current doctrine. So you're just saying it overruled it because it doesn't help you. No, I think the holding of Steele is that it applies to U.S. citizens because Congress has extraordinary power to regulate U.S. citizens abroad and does not raise issues of international law. I see Steele as more consistent with the SG's view. In Steele, the American citizen was in America, bought unnamed parts here, shipped them to Mexico. All of the assembly of the product was in Mexico. Steele, the watch manufacturer, wasn't actually sold the watches in Mexico but to stores that then sold it to American citizens. So I don't know what the difference is. It wasn't as if the American citizen was himself handing the watch to buyers. Retail stores were handing the watch to buyers and they were coming across the border with those watches. Yeah, so Steele thought it was appropriate to apply the Lanham Act to a U.S. citizen where the mark was being used outside of the United States based on some conduct in the United States, essential steps taken in the United States, and in effect... So you ignore the whole part of the decision that had to do with the confusion American consumers had by bringing the watches to be fixed in the United States. The court did acknowledge that one of the effects of the foreign conduct, the use of the mark in Mexico, was potential reputational or confusional harm within the United States. And so it was sort of applying one of the conduct or effects tests that courts had been using for the Exchange Act, for example, and this court rejected it more. Would Steele come out the same way today? I think probably not. So U.S. citizens are also entitled to presumption against extraterritoriality and Steele's reasoning is really out of step with how this court deals with extraterritoriality now. So are you saying that the cleanest thing and the way to bring our cases in line, to bring Steele and maybe this case before us in line with our modern extraterritoriality jurisprudence is just to overrule it? Well, it's certainly... I know you're saying we don't have to. Yes. So I think the cleanest way to decide this case could just say it addressed foreign defendants and not U.S. defendants. The simplest, cleanest way to address the harmony of the law as a whole may be to say that Steele has no further vitality to overrule. So would it be fair to characterize your position as saying Steele would come out a different way today? It's not necessary to overrule that case, but the best way to make sense of Steele going forward would be to narrow it in the way that you're proposing. I think that's right. This court declines to extend decisions that rest on principles that it has since rejected, and I think it's just important to respect the limits that Steele itself placed on its decision, which was we are addressing U.S. citizens because of that longstanding, deeply rooted principle that a country can govern its citizens anywhere in the world, which is something that simply does not apply to foreign defendants. And here you have the risk of conflict with foreign laws and international friction that the European Union has gone out of its way to catalog, and it thinks this is going to disrupt the international trademark system, which is premised on the strict territoriality of trademark protections. It's going to violate treaties that the United States and 178 countries have joined, like the Paris Convention and the Madrid Protocols. A few fewer members, but still many. And it's going to interfere with the administration of other countries' abilities to administer their own trademark laws within their own territories. And that's the conflict that arises from trying to regulate transactions, the use of marks in the marketplace, in commerce, in foreign countries. That's the reason why Morrison declined to apply the Exchange Act extraterritorially, even though courts have been doing that for decades, and it's the reason why it held that the focus of the Act should be a clean test when we're applying it domestically. Where did the transaction that the Act is seeking to regulate occur? And here, that transaction is the use of the mark in commerce. So it's that use of the mark in commerce that needs to occur within the United States for the Lanham Act to be properly applied domestically. Why can't it also be the effects of the use of the mark and where the effects took place? For example, where the confusion took place. So I think it would be unusual for the focus of a statute just to be the effects, because usually when we're talking about effects from foreign commerce that are felt within the United States, we're talking about applying the law extraterritorially. Well, Steele, of course, does talk quite a bit about effects. I mean, Steele is much more about effects than it is about the citizenship of the defendant. So we have Steele, and Steele is very much about how is this felt in the United States. But there's also aspects of our current law that are that. I mean, when RJR talks about the injury, the injury is just a way of saying effects, and it says we're looking for domestic injury here. Yeah, well, so at RJR, I think that's a special situation because there the court held that the substantive conduct regulating provisions were themselves extraterritorial, at least in part. And so the conduct that was being regulated was permissibly extraterritorial. And so then it was saying at the second step for the cause of action, the private cause of action, we need to apply the presumption again. And there we want to make really sure that we are not creating the risk of friction that exists when private liability is imposed for conduct occurring overseas. And so that's why we're going to insist on the domestic injury, even if you have an extraterritorial statute that's been violated. When I look at the cases that we've done in our modern regime, there's a good deal of flexibility, actually, in how we go about picking what the focus is. And you might say, well, that's a downside of our modern regime because it's a little bit amorphous, and you don't quite know whether the focus is on the act that you're regulating or instead the focus is on the people and the interests that you're protecting. But it's also the virtue of our modern law, which is we get to sort of look at a particular statutory regime and say, you know, what makes sense with respect to extraterritorial or with respect to domestic applications of conduct occurring abroad? And so there's a good deal of flexibility, and why shouldn't the flexibility be used in this context to say, look, this whole regime is about confusion. The question is, is it causing domestic confusion? So I have three responses to that. First, I think the regime is really about the use of the mark in commerce. The use of the mark in commerce is how you register a trademark. It's how you maintain a trademark. It's how you infringe a trademark. The registered trademark protects the exclusive right to use the trademark in commerce. But I think the entire backbone of the statute focuses on that use. And I also think context is important. And here we have the longstanding internationally recognized principle that trademark protections are territorial in nature and that foreign trademark protections don't apply within the United States. United States trademark protections do not apply in foreign countries. And so the way you can administer that is through looking at a clear test. And this is my third point. Morrison asked for a clear test to avoid the confusion and haziness that you might have when you're balancing factors to figure out whether something applies to foreign conduct. Can I ask you, do you dispute that there's no trademark violation if the use of the mark in commerce doesn't cause customer confusion? I mean, you continue to say that what the statute cares about and what Congress is trying to regulate is the use of the mark in commerce. But it was my understanding from the statutory scheme that even using a mark, you know, another registered trademark in commerce is not going to be sufficient to trigger liability under the statute. That's true. So the right is defined, the mark holder's right is defined as an exclusive right to use it in commerce. But an intrusion on that right by someone else using the mark is only actionable. It only can give rise to liability if it's likely to cause confusion. All right, so then... That's a condition. I understand. So then how can it be, then, that you say that the focus of this statute is only on the use of the mark? I mean, don't... So if there is domestic confusion about products that are being used in commerce in the United States, they're used in commerce because they're circulating in the United States, people are buying them. We're not just talking about a product that is, you know, in someone's basement or something. They're being used in commerce in the United States. I guess I don't understand why that wouldn't... And, excuse me, confusing people. Why isn't that enough? Well, I think if the goods that are marked with the protected mark are being used in the United States, that would be a domestic use. But I guess your test suggests that the maker, if they're overseas, would have to be the one to put it into commerce. So it would have to be, you know, in order for them to be liable, we'd have to have some idea that the maker themselves is using them in commerce in the United States, directly shipping them in. And I'm not sure I understand why that's the case because I'm sort of hypothesizing, you know, we're walking down the street in Manhattan and we see all of these, you know, fraudulent or fake, fakely branded goods. And if they are made overseas and we can figure out who made them, wouldn't that be sufficient? I wouldn't think so. So, obviously, anyone who is bringing it into the United States, importation is banned under Section 42 of the Act and under 43B. Anyone who is selling them in the United States, you can absolutely get them. Anyone who is outside of the United States, you'd have to have a vicarious or contributory liability theory that hasn't been asserted here. But going after, you know, counterfeiting is a serious problem, but going after people in foreign countries is something that is fraught with foreign affairs. But why is that extraterritorial? That's all I'm asking. So, fine, under the contributory liability theory, which you appear to think is something that can be done here, although not alleged here, why is it extraterritorial to go after the manufacturer of fraudulent goods that are in commerce in the United States? Well, it does raise some additional difficult questions as to when contributory or aiding and abetting qualifies as a domestic application. So, it's happy that it's not raised here because the court doesn't have to get into those questions. But in, you know, Nestle USA, you know, whether aiding and abetting depended on where the aiding and abetting happened or where the underlying tort happened was a difficult question the court didn't decide. And so, I'm not saying that contributory liability would necessarily count as a domestic application, but that would have to be the theory of it for a person who is not themself using it in commerce. And two other points on the use. So, not every use of a mark has to be confusing for it to be subject to liability under the Lanham Act. Olympic emblems, for example. This is 36 U.S.C. 220506C and was addressed in this court decision in San Francisco Arts and Athletics in 483 U.S. 522. Just using them in commerce without any likelihood of confusion is enough to be liable. But the core of the Act is certainly confusing uses. Uses that confuse. And that's, you know, not a purposive question. It's right there in the text of the statute repeatedly. So, you're saying that, well, the focus of the statute is uses of the trademark. That doesn't seem right. The focus of the statute is uses of the trademark that confuse. And if the uses of the trademark that, you know, confuse in the domestic market, that seems as though it should be enough under Morrison. Well, I think in that situation, I think the confusion is certainly a condition for it to be liable. But the use is itself defined as the relevant infringement. That's in Section 33B, 5, and 6 of the Lanham Act. It talks about the use of a mark being charged as an infringement. And the other question, you know, the other thing that Morrison was really concerned about was having a clear test that is not going to create a lot of confusion. Well, Morrison did not create a clear test. I mean, if you, you know, our most recent version of the test is the statute's focus is the object of its solicitude, which can include the conduct it seeks to regulate as well as the parties and interests it seeks to protect or vindicate. So in fact, Morrison created a quite flexible test is that we're allowed to look at a statute and say, what's really the purpose? Sometimes that will be conduct. Sometimes it will be effects. Sometimes it will be one person's conduct. Sometimes, as Morrison shows, it will be an entirely different person's conduct. So, you know, there's a good deal of flexibility in this test. And the question is, why in this case, when we stare at the Lanham Act, isn't the focus of the statute confusing uses? Well, I think one other thing that Morrison thought was really important is that the focus test itself may be a little unclear, but for each statute, having a clear administrable test was really important, which is why it chose a transaction-based test. And if you're looking to where the likelihood of confusion exists, that's a pretty inadministrable test. It's not even where did confusion exist. It's where hypothetically confusion could have existed. That's not a question that's asked under the current likelihood of confusion test. And even likelihood of confusion is governed by a 13-factor test before the PTO. Here, the jury was instructed on seven nondispositive factors that it could give whatever weight it wanted to figure out whether there was a likelihood of confusion. And I think if you have a test that requires juries or courts to balance seven or 13 factors to decide whether a likelihood of confusion exists in the United States, that's the sort of very difficult-to-apply test that Morrison said should not be how we apply U.S. laws to foreign conduct. And the trade show example, I think, is a good example. May I finish? Sure. If trade shows held overseas can lead to domestic confusion when U.S. travelers come back to the United States and every country in the world followed that approach, you'd have U.S. law applies to a Berlin trade show when a U.S. customer walks by, Swiss law when a Swiss customer walks by, and Chinese law when a Chinese customer walks by, and that's no way to administer an international trademark system premised on territoriality. Thank you, Counsel. Justice Thomas? Justice Alito? Justice Sotomayor? It seems to me that your position in this world of the Internet makes very little sense. Foreign buyers today do what almost all buyers do, which is advertise their goods on the Internet, and they purposely target American customers in America. The fact that they choose to deliver those goods at the border outside the United States or into the U.S. to me should make no difference. They are competing with the trademark owner in the U.S. to secure U.S. customers. And so I just can't see your territoriality rule making any sense because the case I gave is a version of Steele, frankly, and I don't see why overturning Steele or making it depend on the citizenship of the defendant is important. I think the SG is right. The issue is whether or not these acts are intended to cause confusion in the U.S., and that Internet sale to me is clearly intended to violate the act. So insofar, once those goods come to the border, the importation, the sale in the United States absolutely falls within the Lanham Act. But not by you, the manufacturer. You advertised it. You delivered it to the border and said to the customer, come with your truck or pay a freight forwarder to bring it to you across the border. You're saying to me that's not actionable. Well, barring some contributory liability, vicarious liability, I think that's right. Why does that make sense, given the purposes of the Lanham Act? So the Lanham Act was enacted in 1946, and if it doesn't perfectly match with how the Internet works today, that's understandable. Congress has actually updated it in certain ways to address the Internet. But what Congress did was say it's not just the use of a mark, it's the use of the mark with the intent to confuse or confusing people. This is a clear case of intending to confuse, the example I gave, of intending to confuse and actually doing it. Yeah. Well, so I do think if it's ever going to reach someone who is only using the mark outside the United States, it would have to be because there is that domestic effect of confusion. Well, that's part of your brief. You pretty much accept. You say as an alternative, don't rule for them, the other side, but accept the SG's test data. That would be the outer bound. Thank you. Justice Kagan, anything further? Justice Gorsuch? Justice Barrett? Justice Jackson? Can I just ask you about a hypothetical, because I'm just trying to understand what it is that you're saying. So we have a German manufacturer of handbags who makes his own handbags, but then also starts making knockoffs of Coach handbags, putting the mark on it just like Coach, and he has no intent of ever giving them or getting them to the United States. He sells only locally in Germany, and none of the bags ever get to the United States. Would it be an extraterritorial application of this statute if Coach tried to sue them? If I'm understanding correctly, yes. The use of the mark is entirely outside of the United States. All right. Same facts, except a group of American students, college students, spend a semester abroad in Germany. They buy the handbags, knockoffs of Coach. They come back to the United States, and people who see them with these bags are really confused because they look like Coach bags, and it starts actually diminishing Coach's brand because the bags are shoddy, and people are confused and Coach is unhappy because people think they're their bags. If Coach sues, is that an extraterritorial application or no? There would be. The use of the mark is occurring outside of the United States. Coach's remedy, as the court explained in Microsoft v. AT&T, is to get German trademark protection, EU trademark protection, and enforce those rights there. Even though the confusion and the damage to goodwill is in the U.S., still extraterritorial? Yes, and I think one reason why that's the right answer is it would have U.S. liability, potential treble damages, something most of the world rejects, How likely do we think it is that American students are going to be coming to this town in Germany and buying handbags? You have the same answer with a third version of this hypothetical, which is the American students are themselves very entrepreneurial, and they take $100,000 and they buy a bunch of these bags, and then they bring them back to the United States, and they put them into commerce in the United States. They're on the street selling them. They're creating their own websites selling them. Coach figures out that these students aren't the ones that are really making the bags. The bags are being made in Germany by this company. Same result for you? No extraterritorial? That would be extraterritorial if Coach tries to sue the manufacturer. The manufacturer in Germany, yes. The students who are selling and advertising the bags in the United States, they can go after them. That's a domestic use of the market commerce. Thank you. Thank you, Counsel. Ms. Hansford? Mr. Chief Justice, and may it please the Court, the Court of Appeals was mistaken in giving the Lanham Act sweeping extraterritorial reach. At the first step of the two-step framework, the provisions here contain no clear affirmative indication of extraterritorial application. And at step two, the focus of each provision is consumer confusion, which is the touchstone of trademark infringement. A use of a trademark that causes a likelihood of confusion in the United States is actionable, just like a misrepresentation made abroad about a security listed on a U.S. stock exchange is actionable under Morrison. That interpretation best makes sense of Steele, and it leads to a common-sense result. A defendant is not liable for transactions that confuse only foreign customers, but a defendant who causes confusion in the United States, misappropriating U.S. goodwill is liable. And although the difference between the government's position and petitioners' is small, it is meaningful. As Justice Sotomayor observed, petitioners would exclude from the Lanham Act's coverage here $2 million worth of products they knew would be used in the United States confusing U.S. consumers, simply because the purchasers, rather than petitioners, arranged for the particular shipment of those goods into this country. I welcome the Court's questions. In order to reach your conclusion, would you have to use an effects test, or would you be relying on the conduct of a petitioner? We would be viewing the confusion as the focus of the act, and we think that the thing to be protected, the interest to be protested, can be the focus under the framework. And we don't think that confusion is an abstract mental state. We think that confusion is actions by consumers. We think it's likely to cause consumers to act confused. And the question is, are consumers acting confused in the United States? So you're not focusing at all on the conduct of the petitioner, except to the extent that petitioner sold the product that causes the confusion? That's correct. Our test is not that petitioner's conduct is not the focus. It's the factor and the thing to be protected. So how proximate does that have to be? What if petitioner sold it to one person who sold it to another who sold it to another who sold it to the students who sold it to someone else who then brought it in the United States? Proximate cause is an important limitation in our theory. We think under this Court's decision in Lexmark, proximate cause under the Lanham Act is the injury, the confusion, has to flow directly from the use. So in a situation like that, proximate cause likely would not be satisfactory. Have we applied this approach internationally in the Lanham Act case, or is this a new test? I think it's the standard two-step framework. I don't think this Court has considered the Lanham Act. I guess I'm not aware of a case in which this Court has applied this test. Would listing the product or the product's appearance on the Internet anywhere always constitute causing confusion? I mean, you have to assume somebody's going to look at it at some point and might be confused. I don't quite know the extent to which your test has any limits at all. No, I don't think listing it on the Internet in general would be actionable because there needs to be a proximate link to particular U.S. confusion. So just the possibility that somebody might see it and become confused is not enough. It needs to be that that confusion will flow directly from a particular use. Your distinction, I think you said two things that sound exactly the same to me. I mean, let's say there is an appearance on the Internet. Somebody looks at it, and that person thinks, oh, that's a nice bowl of a watch, or that doesn't look too good. Is that enough? No, I don't think so. And I think in the Internet context, I think even under a petitioner's test, if a website is targeting U.S. consumers so U.S. consumers can purchase the good from the website or the website will ship the goods into the United States, that is actionable. But just the possibility that somebody might see something on the Internet would not satisfy any practical requirements. Well, but let's say it's an influencer, whatever that is. But a lot of people look at it, and they see the watch. Is that enough? 100,000 people see the ad. It doesn't say, here's how you can get it, or we'll ship it to you. So it just is featured on somebody famous, you know, and that causes a lot of people to not like it or like it, whatever. Absolutely. So in a hypothetical where it is foreseeable and sufficiently direct that consumers in the United States will be confused, we do think that would be actionable, and we think that's not a problem of our test. What are those adjectives again? I think it's the court has not explicated exactly what the approximate cost is. You said foreseeable and direct. Foreseeable and direct, exactly. That's a little bit of my gloss, but I think that's the gist of it. But I think a key limitation on that would be what relief would be available. And the injunctive relief, in order to enjoin that, it would need to be an injunctive relief specific to the landmark violation, which is the confusion of U.S. consumers. So you could tell the website you cannot ship these goods to U.S. consumers, but you can't tell it not to ship the goods to anybody. And if there's no relief, if U.S. consumers are 5% of the people who see this, and so there's really no injunction that would prevent the harm to U.S. consumers without being overbroad, there wouldn't be any relief that's available. But I do think we want that situation to be covered by the landmark, because otherwise it is just a license for people to go to the other side of the border or go in any other country and put things online that are impairing the goodwill of U.S. products. And because their physical actions are occurring abroad, they would be immune. And I don't think that's the best treatment. Under your test, does it matter whether the mark is validly registered in the country where it's used? Suppose it was validly registered in that country, but it is likely to cause confusion in the United States, and does in fact cause confusion in the United States. Would you say there's liability there? Justice Alito, there would be liability under the Lanham Act, but we think that is precisely the situation where international comedy would come in and take care of it. How would that work, international comedy would come in and take care of it? International comedy would be a reason for the court to abstain from hearing the action, and the exact same situation would apply to petitioner's test, because on petitioner's test, conduct in Germany that ships directly into the United States is actionable. But suppose that petitioners did have a valid trademark in Germany. That act in Germany of shipping it to the United States would be actionable under the Lanham Act, under petitioner's theory, but also would be exercising a right that petitioners have under German law, and so I think that has to be resolved by comedy. There's going to be some small amount of overlap where the different nations' interests could come out differently. That would have to be resolved by comedy. The European Union has filed a very strongly worded brief, and they certainly don't think that your position or the decision below was consistent with international comedy. What is the reaction of the United States to that strong protest from the European Union? I disagree with your reading of that brief, Justice Alito. We completely agree with the European Union that the decision below is deeply problematic, and that it gives extraterritorial reach over foreign goodwill, but the European Union's brief is in support of neither party, and it asks for no extraterritorial application, no application under step one. We view the European Union's brief as aligned with us in not taking a position between our position and petitioners, because of course what we're doing in a step two inquiry is trying to figure out which, we agree that the act applies only domestically, only domestic applications are actionable, and then petitioner, and we are just arguing about what constitutes a domestic application in this context, and we don't see the European Union as taking a position on that. What would be your answer to the third hypothetical offered by Justice Jackson? That was the hypothetical where the American students go to Germany, and they buy these knockoff coach bags, and they bring them back to the United States, and they sell them in the United States. Would you say that the maker of those bags in Germany is liable? It would depend on whether the maker had any reason to know that the students were doing this. If the students came to him and said, we want to buy $100,000 worth of handbags to resell in the United States, yes, we think the maker would be liable. If the maker just sells handbags and has no reason to know that these are Americans, and this is to be used in the U.S., we don't think the proximate cause links to the confusion in the United States. Well, what if they bought 50, and they didn't speak any German, and they were wearing a T-shirt with the name of an American college on it? Yes, in that situation, I think that the proximate cause would be foreseeable, that this would cause confusion in the United States, and the Lanham Act would apply. Of course, there would be a question of whether there's personal jurisdiction over the seller in Germany, which I think is normally a major limitation. And another limitation would be the particular relief that would be available. What if they bought 10? Same answer, but if there's – Wait, why does it turn on what the seller intends in that way? I mean, I had understood that at least some commentators thought this statute, the Lanham Act statute, was sort of a strict liability statute. So if the 10 turn up on the street in Manhattan, and they're being sold and causing customer confusion, does it matter whether the manufacturer knew that, intended that, thought that? Why does that matter? Because a particular use needs to proximately cause the confusion, and I think if it's not foreseeable to somebody sitting in Germany, that if they sell something, it's going to end up on the streets of the U.S. in a way. I don't understand that at all, why the foreseeability has anything to do with whether there's proximate cause, meaning a link between the manufacturer of these knockoff bags and the confusion in the United States. I mean, if they're on the street, it would be one thing if the students came back with the 50 bags, and they just gave them to their parents or, you know, their friends or whatever, and they were never in commerce here in the United States, right? Then I think you would agree that that's not causing the kinds of confusion use in commerce that the statute cares about. But if the students buy the 50 bags, whatever the manufacturer thinks, brings them back to the United States, and they're actually being injected into commerce here, causing confusion, why isn't that covered by the statute? I don't think it's a subjective question of what the manufacturer thinks, but if it's not foreseeable, they're going to end up on the streets of the U.S. and injected in commerce here. So, Counselor, I had a similar question. It seemed like you're importing a mens rea requirement into a causation requirement. Are you now withdrawing that? No, I did not mean to import a mens rea requirement. The test is, is there confusion in the United States? Is the confusion linked directly flowing from the use? And that's a proximate cause question. It's going to go to a jury, and they're going to decide what they're going to decide about the reasonable foreseeability. It has nothing to do with the manufacturer's knowledge or intent. That's right. Knowledge and intent is not required. It is required for remedies. But, again, to be clear, the relief that would be available in that circumstance would only be limited to sales to Americans. And I think the flip side is, otherwise, a company can, from abroad, flood the market in the United States in a way that entirely diminishes or drastically misuses U.S. goodwill. And just the fact that the physical actions occur abroad should not be dispositive, and Petitioner recognizes that part of the way, but would draw the difference between the seller in Germany who is shipping directly into the United States as opposed to the seller in Germany who is selling to students who know or don't know but will foreseeably resell. What should we do about steel? So we think that our interpretation lets the court make sense of steel and its further precedence, and that's both because the results in steel would come out the same way under our test and because we do view a significant part of the reasoning in steel to focus on consumer confusion, which is the right way to get there. We think the problem with Petitioner's approach of just limiting steel to U.S. defendants is that that is not a rule that makes any sense. There's no U.S. defendant requirement in the statute, whereas our reading of steel makes sense of it in that it ties into something in the statute, consumer confusion. It seemed like Petitioner's were conceding to the court that their first best solution would be to apply our modern extraterritoriality jurisprudence and be done with steel. What does the government think of that? We agree that you should apply the modern jurisprudence, and we think you can do that without overruling steel, both because it's consistent with the results, the key aspects of the confusion reasoning, and just because of how amorphous steel was. We do think it would be different if steel had set out something that was a specific test. Then that test itself would have stare decisis force, but given how steel was actually reasoned and the ability to kind of replicate it using this court's modern framework, we do think that's what the court should do. Let me put it in my own words, see if you agree with it, and you don't have to. There's no impediment in steel, as you read it, to apply our modern jurisprudence. I agree with that, and I do think that our approach is more consistent than Petitioner's. It is more true to steel, but I agree fundamentally that there's not an impediment in steel to applying the modern jurisprudence. Thank you, Counsel. Justice Thomas? Justice Alito? Under your test, citizenship is irrelevant, right? That's correct. But in steel, it seems to have been quite relevant. The very first sentence of the opinion points out that it defines the issue, and it refers to a citizen and resident of the United States. So you are really asking us to overrule steel in part, are you not? We do disagree with that aspect of steel. Now, it's not presented here, so you don't need to opine on it. We think the better reading is that it's not a relevant factor. But there are, for instance, steel also reaches conclusion as a matter of subject matter jurisdiction. I thought this was a question of subject matter jurisdiction. It's pellucid under this court's precedence. That's not correct. And I don't think the court would have any hesitation in saying, well, that piece of the reasoning was incorrect. And so we view the citizenship as a little bit of something you can set aside, just given the ability to apply the modern framework and replicate kind of the heart of steel in terms of the confusion. Well, I'm not sure how that links with the issue of stare decisis. Are you saying that steel has already been essentially overruled, or are you saying that we should partially overrule it by getting rid of the citizenship element? I guess I think of stare decisis as attaching to the holding of the case, particularly because it doesn't set out a particular test. It just sets out these three amorphous factors without saying how they should apply. The courts of appeals have taken themselves as free to form different tests based on steel because of how amorphous it is. So I don't think anything needs to be overruled, even though there are aspects of steel that the court would not bring forward. But again, on the citizenship in particular, while we don't see a principled reason in the text that citizenship should be relevant, and so it's hard to turn on that as a distinction of steel, the court does not need to opine that in this case because this is not a U.S. citizen. Well, if I were looking for the holding in steel and I were back in law school, I might look at the first sentence of the opinion, which says the issue is whether a United States district court has jurisdiction to award relief to an American corporation against acts of trademark infringement and unfair competition consummated in a foreign country by a citizen and resident of the United States. So you say it's not a jurisdictional issue and it doesn't matter whether it's a citizen or a resident of the United States. It sounds to me like you're asking us to overrule steel in part. Justice Alito, if you read that as the holding in steel, then I think that this is just a situation where steel presents no impediment because it's not a U.S. citizen issue, and then you would kind of take steel out of consideration in deciding between us and petitioner's position, and we think that our position about what the focus of the statute is is the correct one from first principles. The court of trademark infringement is consumer confusion, and if ever there were an object of solicitude, I think this is a really good example in addition to being really parallel to the structure in Morrison. Justice Sotomayor? Justice Alito talked about the European theory. I am reading from page 21 of that brief, and the brief says, Substantively, the union law, they mean European union law, tests for infringement is similar to the U.S.'s likelihood of confusion test. A court in any member country, including Germany, that is competent to rule on trademark infringement would assess whether there exists a likelihood of confusion on the part of the public. And it goes on to say that the test for that in these member countries concerns use that occurs in the union or in individual member countries. Consumer confusion includes acts of targeting customers in the territory of the union, but it excludes the mere accessibility on a website of the territory covered by the trademark. That is very consistent with what you are saying, correct? Yes, I think that is consistent. The European Union itself seems to define consumer confusion in a way that reaches acts abroad, putting up a website, taking down a website, as long as it has particular effects. And the German professor's brief also gives the example of negligent causation of patent infringement within the German territory. If you are causing it from abroad, but the infringement is within. So I do think that, I am not saying that our law is on all fours with the laws of European countries, but this question of exactly what acts from outside that reach the goodwill within the country, I think we are, on a big picture level, using similar approaches. Justice Kagan? Mr. Hansford, I think everyone might be underselling Steele here. I mean, it is true what Justice Alito says about this first sentence. It sets up the question in an odd way. But the actual holding and heart of the opinion is on page 286. And that is where the court says, okay, we deem the Lanham Act's scope to encompass petitioner's activities here. And then it says, why? Why do we deem it that way? His operations and their effects weren't confined within the territorial limits of a foreign nation. He brought component parts of his wares in the U.S. and Belova's filtered through the Mexican border into this country. His competing goods reflected adversely on Belova's trade reputation and markets cultivated here as well as abroad. So in some ways, I mean, what Steele says here on page 286, it doesn't use the two-step terminology that we've developed, but this is basically the second step as we've understood it. I agree with that, Justice Kagan. I think the best reading of Steele is that the test is remarkably consistent with the test that you would reach under the modern framework. So this is not a situation where you need to, now that you're considering how to interpret the Lanham Act, reject this Court's modern precedents and adopt some textual amorphous approach because Steele reaches the right result. It says that consumer education is the focus. And for exactly the reasons that you're suggesting we ought to apply under what has now become a structured second part of a two-part test. Yes, so we think that Steele is consistent with our approach and that consumer education is a great reason to rule for us and to pick our position over petitioners, but we also think you can get there in various other ways. Justice Gorsuch? The focus of a statute. It's pretty, I'm not sure how structured that really is, our test. I think of it this way. The question is when does the legal action accrue? And under the Lanham Act, you have to have consumer confusion for you to have a cause of action, generally speaking. What's wrong with thinking about the focus of a statute as when it accrues? And the result in this case is that consumer confusion is the focus. It doesn't change the outcome. It's just instead of asking kind of a metaphysical question about a statute's focus, which seems to me to kind of call for a legislative seance, what were they really up to? We could just ask when the cause of action accrues. Is there any daylight there in your mind? So there does not seem to be any daylight in this particular case. Standing here, I can't, I'm not entirely sure whether it would cause problems in other cases. It seems like a reasonable approach. The one thing I would say is I do think that there's some flexibility in the inquiry because you're trying to understand what it was that is the object of the statute's solicitude, such as that's the part that Congress wanted to apply. That legislative seance thing, yeah. The legislative seance thing. But I do think that what you're saying about when the cause of action accrues in many ways tracks what the court did in Morrison because it emphasized that it wasn't just a misrepresentation. It's a subset of misrepresentation in connection with the securities market. So that does seem consistent with the mode of reasoning in Morrison and precisely the mode of reasoning we think determines this case in our favor. It's just that I don't want to commit to that position without thinking through all the implications. Thank you. Justice Kavanaugh? In how you would deal with Steele, I think you're saying that it would be a mistake to leave the law after we decide this case in a place where there's a different rule for U.S. defendants and foreign defendants. Yes. I think that would be one technical way of getting around Steele, but it's not ideal because it does not make a lot of sense why that would be a distinction. There's just nothing in the statute that distinguishes between the different types. I agree with that. And then can you add to that? Would there be problems created by having one rule for U.S. defendants and a different rule for foreign defendants in how the statute applies? I get your point about the logic. I'm wondering if the logic translates into real-world problems as well if you left the law in that place after we try to deal with Steele. Well, I think if you allow the statute to have extraterritorial reach where U.S. defendants are involved, the problem is still that that allows the U.S. to regulate consumer confusion in other countries and to regulate misappropriations of foreign goodwill any time you have a U.S. defendant. And so the comity considerations in that circumstance may be a little bit less because it's a U.S. defendant, but we still think it's a problem to have U.S. law be governing effectively the trademark rights under the territoriality principle in other countries. Thank you. Justice Jackson? So I, like Justice Gorsuch, are trying to figure out what's really going on here in terms of whether it makes sense to talk about the statute's focus in this way. And I guess I'm struggling with what appears to be your reticence to have use in commerce be a part of the focus. I thought of it as use in domestic commerce, meaning these items are circulating in domestic markets in a way that causes customer confusion. And if you think of it in that way, I think that you avoid some of these hypotheticals about Internet, you know, manufacture overseas, advertising overseas that are just confusing people in the abstract in the United States. The items have to be here being used in commerce domestically and that that's causing confusion. Is that a problematic way to think about this? So we would disagree that. I think that that would be kind of having two focuses. Yes. But it's not, I guess it's not clear in that situation. The court has never had two focuses before. Not in Morrison. You didn't read Morrison as having more than one focus. No, we think the misrepresentation can happen abroad and I think there are different focuses for different parts of the statute, but at any particular time, there's just one. And I guess to give you a more concrete reason, I think that on our view, if there's confusion in the U.S., that's true even if there is no commerce in the U.S. So in this case, if the purchasers bring in goods just for their own use, but they're bringing in the Bolova watches for their own use and they're breaking and they're forming a bad impression of Bolova here in a way that impacts their future sales, we don't think that it matters that the purchasers weren't reselling the watches or that there wasn't additional commerce going on in the United States. I see. That's my step two hypothetical. You think it still covers. I mean, that's my second hypothetical. The students are bringing the bags back just for themselves and they're breaking down and people are going, ugh, we don't want to buy coach bags as a result. You still think the statute covers that? We still think that's covered. Thank you. Thank you, counsel. Mr. Hellman. Thank you, Mr. Chief Justice, and may it please the court. Since 1952, this court has held and repeatedly reaffirmed that the Lanham Act's uniquely broad language reaches infringement of U.S. marks that is carried out overseas. And during those 70 years, Congress has amended the act 36 times and it has never pulled back on the act's extraterritorial reach. This court should maintain the status quo. It should maintain it as a matter of precedent. The Lanham Act has been this court's go-to example of a statute whose, quote, sweeping language reaches to the limits of Congress's powers and differentiates it from other, quote, boilerplate statutes. What this court said in Steele, in Aramco, and in Morrison should not be cast aside. The court should also maintain the status quo because petitioners' policy arguments fail on their own terms. As of 2018, there were 72 cases considering the act extraterritorially as to foreign defendants. For all of petitioners' predictions of conflict, not one of them granted relief under the act where the defendant possessed superior foreign rights. Instead, what the act has done is to protect U.S. markholders with a much-needed remedy in cases just like this one against foreign trademark pirates who market knockoff goods that siphon the goodwill and sales of U.S. markholders. Seventy years of experience shows that the floodgates haven't opened and that the Lanham Act has instead served as a bulwark against infringement that has an obvious and substantial and, in this case, a decidedly intended effect on U.S. commerce, just as Congress provided. Petitioners' demand that the act should now be weakened should be addressed to Congress, not this court. But even if the court were to conclude that the act applies only domestically, it should still affirm because petitioners' infringement implicated both concerns of the act here, harm to markholders and harm to consumers. Hedtronics suffered from infringement right here in the United States, and petitioners obtained their ill-gotten gains from a web of infringing uses, all of which were likely to confuse American consumers. And with that, I'd be happy to answer the court's questions. What are the limits of your argument? Let's consider the application of your rule to purely foreign transactions. Yes. But you think it has an effect on your company. Yes. Is there any limit? Is there a proximate cost limit? Yes. Would you explain? Sure. There are going to be multiple barriers to relief, which is one reason why I think you see a relatively few number of cases. First of all, in the real world, if you'll allow me, personal jurisdiction is going to be an absolute bar to many, many cases. But then, just with respect to the Lanham Act itself, there are multiple considerations, multiple bars. The effect needs to be substantial. Insubstantial effects don't count. Secondly, the nature of the Lanham Act likelihood of confusion test distinguishes between uses, between marks that don't look the same, that aren't for the same products, where the petitioner or the plaintiff's mark isn't well-known in the area, where the defendant acts in bad faith. If I may, what those factors work out to in practice is, one vision of this is somebody's out there in a foreign country using the same mark that happens to be the same as a U.S. mark, but there's no competition between those goods. There's no confusion between those goods. Those claims are going to fail at the liability stage. But where there's often an intentional attempt to siphon that goodwill from a well-known mark, as we had in this case, that is where the courts have generally found there to be liability under the Lanham Act extraterritorially. I think I'm a bit more interested in your effects tests. You said substantial effects, and we see how extensive and how broadly that test is used in domestic commerce clause cases. Yes. Are you importing that line of reasoning or that approach? Because I don't see, beyond your jurisdictional point, I don't see what the outer limits are. Substantial effects in the foreign commerce clause area hasn't been defined by this Court. The Court has called it a broad power. The Court has called it a plenary power. But even if you think that that is a modest limit here, you still have the nature of the Lanham Act inquiry itself, along with proximate cause and everything else my friends have been talking about this morning. But, again, the likelihood of confusion test distinguishes by its very nature those kinds of uses of the mark that are incidental, that aren't particularly close, versus the ones that are intended to get something very valuable from that plaintiff mark holder. And, again, we're not writing on a blank slate here. The question of whether or not the Act overcomes the presumption was expressly addressed by the Court in Steele. It was the subject of the dissent which said the Lanham Act isn't explicit enough to overcome the presumption. That was the dissent's position in that case, and the majority found the other way. And that's not a revisionist reading of Steele. It's exactly what this case said in Aramco. In Aramco, the government took the position that Title VII must apply extraterritorially just like the Lanham Act does. And the Court said, no, that's not right, and not because it found the Lanham Act wanting. What it emphasized instead was that the sweeping language unique in the civil code, there is no other commerce power defined in the same way that the Lanham Act does, unique in the civil code made the Lanham Act different from other kinds of boilerplate statutes. Justice Kagan referred to perhaps we were underselling Steele. I agree that what we heard this morning does undersell it, but I think you can go even a little bit further with what Steele says. Steele, as Justice Kagan quoted, talked about the infringement harming Volova's reputation not just in the United States but in markets abroad. And there's been a lot of discussion this morning about can you limit Steele just to U.S. defendants. I don't think that's giving the case a coherent reading. I do not believe the Court said in Steele, it would be quite surprising if it did say that U.S. statutes apply extraterritorially so long as there's a U.S. defendant. That's not something the Court's ever said, and I don't think that makes the best sense of what Steele said. But Steele, again, pointed to the sweeping language of the Commerce provision of the statute as giving rise to overcoming the presumption. What would you say to the EU brief? I would say to the EU brief, one, no one suggests that we've been violating our treaties for 70 years. I don't even think the EU brief says that. Two, I almost feel uncomfortable talking about the geopolitical consequences of this. These are arguments that should be addressed to Congress. This Court has said for 70 years that the Act applies extraterritorially. We could disagree about whether or not that was the right ruling in Steele, but it is inarguable that that's how the Court's decision has been understood by this Court and by lower courts. If a different balance of trademark law is called for, that is a question for Congress, which, again, has tended to the Lanham Act with great care, 36 amendments, including ones in response to decisions from this Court, in the Trademark Modernization Act of just a few years ago. Those are arguments that are best addressed across the street. We're not writing on a blank slate. Do you agree that the world takes a territorial approach to trademark law? The world takes a... I do agree with that, but I don't agree with what that means for this case. The territorial approach to trademark law, and the Paris Convention predates Steele, so this territorial approach that everyone is talking about simply means that each nation is the ultimate arbiter of its own trademark laws. The Germans decide what a German mark is, and the U.S. decides what a U.S. mark is. But that doesn't mean, in fact, it means the opposite. The U.S. is allowed to decide that where foreign conduct has a substantial effect on U.S. commerce and harms goodwill, et cetera, that is actionable under the Lanham Act, and that's how it's been for 70 years. There's a little bit of a... With respect to my friends on the other side, a touch of an air of unreality to the discussion this morning. We're not trying to predict how the Act would work extraterritorially. It has been working extraterritorially for 70 years. And again, I hear my friends on the other side saying, maybe that wasn't the right decision. We certainly think it was, but no one can dispute that has been the law, and normally when this court is pressed with an argument that says it ought to reinterpret a statute based on intervening elements, that's where it usually says go to Congress. Do you think that the Lanham Act reaches every act that Congress could regulate on the ground that it was a regulation of foreign commerce? I think... I'm a textualist. It says all commerce that Congress may lawfully regulate. That is the only time Congress has used that language in any statute. So... Yeah, no. What I'm asking is, is that equivalent to the full scope of the foreign commerce clause? Anything that occurs in Germany or any other foreign country that Congress could regulate would be within Congress's constitutional power to regulate. That's what the Lanham Act reaches. That is the best reading of the text. It's what this court said it meant. And I'd also point out this wasn't an accidental happenstance holding in Steele. Steele pointed to the Morris case and the vacuum oil case as examples of earlier trademark laws being applied to foreign defendants. How does that fit with your substantial effects approximate clause test? Sure. Substantial effects is baked into the test of what Congress... Substantial effects is a constitutional limitation on that, as I understand it from this court's cases. So you need to have substantial effects. Then the Lanham Act just talks about the regulation of commerce to that extent, but there remain background principles, including the text of the statute, talking about the remedial principles for what it would mean for when you can get certain remedies and when you're entitled to relief. This is a liability question in the first instance. So there's no inconsistency there. And again, this is how the Act has worked for... I hesitate to repeat myself, but it's important. It's pretty rare for this court to have 70 years of experience with the statute, Congress acquiescence in that, and then to say... I think my friends on the other side are suggesting that you give Steele a much narrower reading than what it actually said. So can I ask you, just in terms of your liability principles here, are you saying that you view Steele and the existing law with respect to extraterritoriality to allow for a trademark infringement claim to be brought against a foreign company that is using a mark in the foreign country to make goods that never leave that country, never come to the United States? It would be harder to have a substantial effect on U.S. commerce in that case. But my test is the following, and I follow the text of the Act to come up... This is how I reach this result. The question is, is it a use in commerce, meaning a use in commerce that Congress can regulate, that is likely to confuse? But Congress can't regulate foreign commerce, correct? If these products are just being bought and sold in a foreign country, our Congress would not be able to regulate that. I think that's probably right, Your Honor. All right, so even if that use in commerce in a foreign country is causing domestic confusion somehow, let's say people see it through the Internet, they see it on television, they're somehow confused, I don't know, I can't think of a way, but let's say that's the case, is it your view that even if we can determine that there is a substantial effect, people stop buying the original product in the United States based on the fact that there is a mark being made on this product in another country but those items never reach the United States, your view is the Act applies? The Act can apply if, for example, this case is a good example, but I could give you other scenarios in which it would apply. So again, for there to be any application, you need to have likelihood of confusion. If the plaintiff's mark and the defendant's mark never meet, no one's ever confused, there's not going to be... Right, but my hypothetical assumes confusion. But your hypothetical assumes confusion. Right, I'm just saying confusion caused by products that are made and kept overseas. Yes, and this case is an example of a substantial line of cases that holds, for example, where the plaintiff can prove diverted sales, sales that would otherwise go from the United States to a foreign country. Yes. That is commerce that Congress can regulate. It's done it for 100 years in the antitrust context. Foreign collusive behavior that harms U.S. exporters, long been actionable in this country. So even if the goods stay in Europe, which they don't necessarily do in this case, but just on your hypothetical, even if they do, what we showed in this case and what other plaintiffs have shown is that where you have that likelihood of confusion and you have those diverted sales, that is an effect on U.S. commerce. It absolutely is. But, of course, that wasn't really the facts in Steele, right? So we don't get that from Steele. You're getting that from what? I do get it from Steele, Your Honor. Steele does have the genesis of this because Steele talked about... But the watches made their way into the United States. Some did, and some goods here did as well. And then went into repair shops here, and that was in commerce here. That was part of Steele, Your Honor, but there's more to Steele. Steele also explains in that core passage that Justice Kagan referred to as the heart of the decision, the claim is good because his competing goods could well reflect adversely on Volvo Watch's trade reputation in markets cultivated by advertising here as well as abroad. The court understood, as I think it faithfully would, consistent with the nature of the commerce provision in the case, if Petronik, my client, isn't able to sell to those German customers, notwithstanding the fact that it has spent a lot of time and effort to become well-known to them due to an infringing conduct, that's exactly what Steele was talking about, and that's exactly how Steele has been interpreted in the intervening 70 years. Why didn't you sue in Germany? You had a strong declaration from the European Union that the petitioners didn't have rights to the marks they were using. That's correct. The defendants here don't have the rights in Europe as well. We have brought suit in the European courts. A couple points on that. To the extent this court is thinking that it's always going to be available to bring any sort of action in a foreign court, that's not going to be the case with many countries that don't have intellectual property rights that are not signatories to the treaties that my friends have been talking about. It's also the case that Congress made the decision in the Lanham Act to provide an additional remedy. We have sued in the German courts. We are able to get some relief there, but we're also able to get other relief under the U.S. laws. Again, if that balance is out of whack, I submit it's not this court's job, having found the act applies extraterritorially, to try to adjust it itself. You hear the troubles that the other side had articulated. What should you do with steel in light of what it said? I've heard it should be limited to U.S. defendants only. That's not giving steel credit for what steel said. It doesn't lead to a coherent opinion. Congress may have the ability to regulate Americans doing things overseas, but the question is, does the Lanham Act overcome the presumption that Congress usually doesn't allow that? Here it did, not on the basis of a citizenship test alone, but on the basis of that uniquely broad commerce provision. And again, the very fact that steel is citing foreign defendant cases tells you that it wasn't just limiting itself to U.S. defendants, and that's exactly what the court said in Aramco. And again, in Morrison, we talked about the modern framework. The very case that inaugurates the modern framework holds on to steel as saying that is an example of a statute that applies extraterritorially, and not in a passing observation. It made the point affirmatively to rebut an argument by the government that the Lanham Act wasn't, in fact, an extraterritorial statute. So again, zealot-like, the Lanham Act appears in your court's cases to say where this court has pointed to as it being different and special, and I submit with 70 years of experience behind us with it, the right, of course, is to allow Congress to change it if Congress so sees fit. The other point I'd make about the international nature of this question is that there's one entity that submitted an amicus brief that represents both U.S. and international interests in this case. That is the INTA brief, the International Trademark Association's brief. They, along with the other trademark associations in this case, all say that the Act should apply extraterritorially. All of them hold to that. So again, with 70 years behind us, the proper course for this court is to continue to allow the Act to apply extraterritorially. If I may, I'd like to talk a little bit about the domestic focus aspect of the case as well. We certainly agree with the United States that uses that pose a likelihood of confusion to American consumers fall within the Act under that kind of domestic focus theory. But that's really only half the story in terms of what the Act is concerned with. The Act is also concerned with harm to markholders. That's right there in the intent, the enacted intent, statement of purpose of the Act. It's also what this court has said time and again when talking about the purposes of the Lanham Act. It's double focus, doubly concerned, both harm to the markholders and confusion. Justice Gorsuch, I heard your suggestion that perhaps you look to when the Act or when the claim accrues as understanding when the focus might come into focus. Well, that likelihood of consumer confusion is simultaneous with the harm to goodwill. Those two things are two sides of the same coin. And so we suggest that if the court is going to look to treat the Act domestically, it should not limit itself to just one focus but both focuses that are mentioned right there in the stated purpose of the Act and capture what the Act is concerned with. Loss to goodwill, harm to goodwill is just as important under the Act as consumer confusion. In fact, it's so important that consumers aren't allowed to bring lawsuits under the Act for their confusion. The only entity that's allowed to sue under the Lanham Act is the markholder. It's a markholder only, that's what the court said in Lexmark, only the markholder has standing to bring suit. And if the court understands the Lanham Act in that domestic way, it should affirm because the evidence here showed that there was harm to the markholder right here in the United States with Hattronic losing diverted sales and reputational harm. Again, we had a whole trial in this case along with injunctive findings by the trial court. The record in this case shows that Hattronic was plagued with complaints about devices that its customers thought were Hattronics when in fact they were the infringing devices. That kind of harm to reputation evinces both consumer confusion and harm to the markholder. Both of them are foci of the Act and both of them should be considered to the extent that the court has in terms of the domestic application. I should have gone through the record more carefully, but I thought that the petitioner's product looked like your product but had a different name on it, correct? It looks like our product and it has a different name, but what they said was the Hattronic you know, it's now us. So it's not the product that caused confusion. It was the acts of the petitioner because the petitioner was representing they were you. Is that it? It's both. I mean the similarity of the devices. They look the same, but they have different names. Yes. All right. But I think that if a consumer sees those things, the next question is are they the same product? Because I know many consumers go abroad and know that the counterfeit items are knockoffs. They want to pay the lesser price to have the value of the mark. So there's no consumer confusion in that. Right. So one clarification, some of them did have the same product names. The Nova had the same name for both of ours and the competitors. Now, again, in terms of whether or not there was likelihood of confusion in this case, you know, the jury found that there was. So in this case, perhaps not in every case. I guess I didn't fully understand your point. Your point is if they hadn't told the world that they were you, those customers would have come to you. Yes, because they were our customers. And that gets to another textual point that I think is important that may have gotten not the time it deserves this morning so far. The Lanham Act reaches infringing uses of a mark. A use is not just a sale. A use is, to quote the statute, the offering for sale, the distribution or advertising of the good. So the Lanham Act, if the court believes that uses that are likely to confuse Americans fall within the Act, then it should follow the Act's text and recognize that advertising, offering for sale, those are the kinds of uses Congress was concerned with just as much as the sale. And so when you have something like a trade show in this case where literally there's our booth and the other side's booth and they're saying that they're us and they're offering their product for sale, it's that use that is the evil that the Lanham Act looks to in the first instance. And then if there's consumer confusion and loss of goodwill from that use because it's infringing, that's when you have a violation that accrues. And even if that trade show is in Germany? Even if that trade show is in Germany because otherwise you're going to be setting up a system where you really will be giving a recipe to infringers to target Americans, to flood foreign markets with foreign goods. I understand, but you're saying that Steele actually goes as far as saying that if there's a trade show in Germany where you're there with your products and Arbitron is there with their products in two adjoining booths, that that's a violation of the Act just because they're advertising products that are using your marks? It could be a violation and was in this case because of the likelihood of confusion that resulted from that use. It's not going to be the case. I don't know what marks are being used around Europe or in other countries right now. Most of them aren't marketed side by side with the real thing with someone claiming that they're the actual mark holder. That's what this case is and that's why that use was likely to confuse Americans. And even under the government's test, it's likely to confuse Americans, then that is the kind of use that the Act prohibits. And I don't think it should make a difference if the trade show is in Denver versus Berlin for that. But I think it has to, right? In terms of the presumption of extraterritoriality, this trade show is in Germany and fine, there's a confusing thing happening with the marks, but are you saying because Americans could be there, then that would be the basis for the application of the Lanham Act in that circumstance? What if there were no Americans at this trade show? If there's no, under the government's view, under the test the government's offering, the question is likelihood of American confusion. We're just asking for normal trademark law to be applied. Normal trademark law recognizes three kinds of confusion. There's initial interest confusion, there's confusion attendant with the sale, and there's post-sale confusion where the good is circulating around. Any of those uses that lead to, in a causal way, those kinds of confusions are actionable under the Act. In this part of the case, we're just simply saying apply trademark law. In fact, in every part of this case, we're saying apply trademark law as it has been applied. But particularly in this instance, yes, if someone is out there targeting Americans or such that there's a substantial effect on U.S. commerce due to that confusion with Americans, that is actionable. Otherwise, if you don't hold that, you are really giving a license for all sorts of manipulation of the kind that I think petitioners were talking about. Someone doesn't sell directly to Americans but knows that Americans will see it. The Lanham Act should be available, has been available. If anybody's going to say that the Lanham Act doesn't reach that kind of thing, it should be Congress, not this Court, given the history of the Act in this Court to date. Thank you. Mr. Walker, rebuttal. Thank you. A few quick points on the record. The only complaint that Hedronic International actually received from a customer was a European customer. And they actually, as soon as they saw the genuine Hedronic part, they said, oh, that's not the product that I have. They told them apart on site. That's JA-34. The goods that eventually reached the United States, this was not handing someone to a messenger to carry across the border. They were selling to foreign manufacturers of cranes and other heavy equipment. We sold the remote controls. They incorporated them with the cranes. The cranes were sold into the United States or were used by the foreign buyer. It's not even clear that the controls would be seen by any consumer in the United States. JA-5 and 6 talk about that. The letters that purportedly said that we are the real Hedronic, they said we parted ways with the other Hedronic locations. We're Abitron now. We're the same company. Hedronic Germany began operating as Abitron Germany. But they said we are not Hedronic. Those are other guys. That's JA-15. Now, there was some dissatisfaction with the focus test, and so I think there is another way to say that the statute requires a domestic use in commerce, and that's just looking at the text itself. So Sections 32 and 43, the causes of action, they require the use of the mark in commerce. Now, as the government correctly recognizes, the commerce definition does not overcome the presumption against extraterritoriality. So that means it's talking about domestic commerce. It requires a domestic use of the mark in commerce within the United States, and that ends up reading the use in commerce consistently throughout the entire statute because the use in commerce of a mark is also required under Section 1 to register a mark.  The PTO has, for the entire existence of the Act, correctly recognizes that that's a domestic use in commerce. It wouldn't make any sense to allow a U.S. trademark right to be based on uses of the mark outside of the United States. That's why the statute itself says in Section 2D that when the PTO is examining trademark registration applications, it has to consider resemblance to other marks previously used in the United States. If it was going to be affording protection outside of the United States, you'd want the PTO to be examining against uses outside of the United States. A couple other textual points to make very quickly. The amendments, I think my friend said there were about 38 amendments to the Lanham Act. There are no relevant amendments except for two. Section 7 was amended to say that filing the application gives a right of priority that is nationwide in effect. It wouldn't make any sense for that to be a nationwide right of priority if it was purporting to give rights that apply outside of this nation. Congress also amended the Act to implement the Madrid Protocol, and that is all about territorial extension of trademark protections that exist in one country into the territory of another country. And the way it does that is not by projecting first country's laws into the second country's territory by its own force, but by obtaining rights under the domestic law of the second country. That's the way the territorial trademark regime that the United States and 178 other countries have signed on to works. Going to the other proposed foci of the Act, the international test ends up applying the Act the same if it's extraterritorial and the same if it's domestic, which I think is a good sign that that's not really a domestic application of the Act. But we're talking about foreign conduct with an effect in the United States that's historically been an extraterritorial application of the Act. But international will go a step further and essentially allow any U.S. citizen plaintiff to bring the suit because it feels any harm suffered abroad at its home. And that not only gives it an overwhelming protectionist scope, it also violates the nondiscrimination principle of the Paris Convention, which requires the same remedies be given to both U.S. citizens with U.S. trademarks and foreign citizens with U.S. trademarks. Going to the government's test, I originally thought from their briefing that they said use the likelihood of confusion test that we already used to determine liability, that 13-factor or 7-factor test. But now they say it actually needs to be actual confusion, and not just a likelihood of confusion. I'm not sure how they've reconciled that with the text of the statute, but that's yet another test departing from current law. It's not just an off-the-shelf test. It also says, well, if there's any problems, we can go to COMETI. But COMETI has never been a substitute for rigorously enforcing this court's extraterritoriality doctrine. And it adds another seven judge-made nondispositive factors to figure out whether U.S. law ends up governing conduct and transactions that are occurring in the territories of foreign countries. The focus test might be flexible, but it favors an administrable test. Thank you, counsel. The case is submitted.